## UNITED STATES v. HOFFMAN.

### No. 10308.

United States Court of Appeals
Third Circuit.

Argued Nov. 6, 1950.

Decided Dec. 8, 1950.

Rehearing Denied Dec. 27, 1950.

618

William A. Gray, Philadelphia, Pa., for appellant.

M. H. Goldschein, Sp. Asst. to Atty. Gen. (Justinus Gould, Drew J. T. O'Keefe and Vincent P. Russo, Sp. Assts. to Atty. Gen., on the brief), for appellee.

Before GOODRICH, KALODNER, and HASTIE, Circuit Judges.

HASTIE, Circuit Judge.

This is an appeal from an order of the United States District Court for the Eastern District of Pennsylvania adjudging the appellant, Samuel L. Hoffman, guilty of criminal contempt, and sentencing him to imprisonment for five months.

The issue raised is whether the appellant was privileged to refuse to answer certain questions put to him by a federal grand jury on the ground that his answer might incriminate him of a federal offense.

The grand jury in question was duly impaneled and sworn on September 14, 1950, and thereupon undertook an "investigation concerning frauds upon and conspiracies to defraud the Government of the United States, involving violations of the customs, narcotics, and internal revenue liquor laws of the United States, as well as violations of the White Slave Traffic Act, perjury, bribery, and other criminal laws of the United States, and conspiracy to commit all such offenses."[1]

Pursuant to subpoena issued by this jury, the appellant, Hoffman, appeared as a witness on October 3, 1950. He refused to answer certain questions propounded to him by the grand jury on the ground that his answers might incriminate him of a federal offense.[2] Subsequently, he appeared before the district court where the claim of privilege was challenged by the government. The court heard the questions propounded to the witness and the

---

1. This exact statement was placed before the district court in the government's petition to cite the appellant for contempt filed pursuant to Rule 42(a) of the Federal Rules of Criminal Procedure, 18 U. S.C.A.

2. The government's petition alleged that his refusal was made on the basis that the answers "might tend to incriminate him". In course of argument, the appellant was apparently allowed to take issue with this orally and assert by way of unwritten answer that he claimed the answers "might incriminate him of a federal offense".

answers he made thereto. After hearing argument of counsel for the witness, it found that the witness had been subjected to no real and substantial danger of incrimination for a federal offense, and ordered him to reappear before the grand jury and answer the questions which he had theretofore refused to answer.

The appellant stated in open court and in the presence of his counsel that he would not obey this order. The court thereupon found him guilty of contempt of court by wilful disobedience of its lawful order constituting misbehavior in its presence, and sentenced him.[3]

The only issue before us on this appeal is whether the appellant's claim of privilege was properly overruled.

The questions and answers in issue fall into two groups. The first concerns appellant's occupation, and is as follows:

"1. Q. What do you do now, Mr. Hoffman? A. I refuse to answer."

"2. Q. Have you been in the same undertaking since the first of the year? A. I don't understand the question.

Q. Have you been doing the same thing you are doing now since the first of the year? A. I refuse to answer."

The second concerns appellant's knowledge of the whereabouts of one William Weisberg, and is as follows:

"3. Q. Do you know Mr. William Weisberg? A. I do.

Q. How long have you known him? A. Practically twenty years, I guess.

Q. When did you last see him? A. I refuse to answer."

"4. Q. Have you seen him this week? A. I refuse to answer."

"5. Q. Do you know that a subpoena has been issued for Mr. Weisberg? A. I heard about it in Court.

Q. Have you talked with him on the telephone this week? A. I refuse to answer."

"6. Q. Do you know where Mr. William Weisberg is now? A. I refuse to answer."

The appellant's claim of privilege not to answer these questions is based on the provision of the Fifth Amendment that "No person * * * shall be compelled in any Criminal Case to be a witness against himself * * *."[4] It was observed very early, however, that the interest of the United States in the testimony of every citizen foreclosed an unbridled application of the privilege. See United States v. Burr (In re Willie), 1807, 25 Fed.Cas. pages 38, 39, No. 14,692e. Whatever conflict there was in the application of the two interests was thought to have been resolved by Chief Justice Marshall's enunciation of the now famous test: "When a question is propounded, it belongs to the court to consider and to decide whether any direct answer to it can implicate the witness. If this be decided in the negative, then he may answer it without violating the privilege which is secured to him by law. If a direct answer to it may criminate himself, then he must be the sole judge what his answer would be." United States v. Burr, supra, 25 Fed. Cas. p. 40. See Mason v. United States, 1917, 244 U.S. 362, 364, 37 S.Ct. 621, 61 L.Ed. 1198; Camarota v. United States, 3 Cir.1940, 111 F.2d 243, 245. It is not disputed that this prohibition applies to proceedings before a grand jury of the United States. Counselman v. Hitchcock, 1892, 142 U.S. 547, 12 S.Ct. 195, 35 L.Ed. 1110; United States v. Monia, 1943, 317 U.S. 424, 63 S.Ct. 409, 87 L.Ed. 376.

### A

The first of two situations where dispute is likely to occur over the application of the Marshall rule is illustrated by the questions directed to appellant with regard to the whereabouts of William Weisberg. It is not claimed by the appellant that the answers to the questions

---

3. The various proceedings before the court leading to the sentence actually occurred on three different days. But this is of no importance to the result.

4. U.S.Const. Amend. V.

will in themselves incriminate him, but only that they expose him to danger in that they, in conjunction with other information, may lead to revelation that appellant is guilty of a federal offense. The reality of this danger is the matter in dispute upon which the privilege depends.

■ Where the risk is made apparent and appears substantial, the constitutional proscription has been held applicable. But in cases where the danger is not obvious, decision has depended upon the degree of likelihood of linkage between the probable answer and a crime. E. g., United States v. Weisman, 2 Cir.1940, 111 F.2d. 260; United States v. Rosen, 2 Cir. 1949, 174 F.2d 187; United States v. Zwillman, 2 Cir.1940, 108 F.2d 802. It may well be that no more helpful generalization of the degree of likelihood required can be devised than Judge Learned Hand's often quoted statement: "* * * perhaps in the end we should say no more than that the chase must not get too hot; or the scent, too fresh." United States v. Weisman, supra, 111 F.2d 263.

■ We do not think appellant's admission that he had seen Weisberg within the week, or had talked to him within the week, or that he knew where he was, or a statement when he last saw him, could come dangerously close to involving him

in a federal offense. We cannot see that any answer to this would be likely to differentiate appellant at all or in any significant way from a considerable number of blameless people. It was suggested that he would perhaps be subject to punishment for obstructing justice, pursuant to Section 371 or Section 1501 of the Criminal Code, 18 U.S.C.A.[5] The sole basis for this claim is the fact, widely publicized, and known to the witness that a subpoena had been issued but not served requiring Weisberg to appear before this grand jury. However, the relationship between possible admissions in answer to the questions asked appellant and the proscription of those sections would need to be much closer for us to conclude that there was real danger in answering. In the nature of this problem, analogical comparison of cases is difficult. However, we think it worth noting that any possible answers would, in our judgment, have come no closer to connecting appellant with wrongdoing than the answers which were required by this court in Camarota v. United States, supra.

**B**

A more difficult problem arises in applying to the first group of questions [6] concerning the business of the witness the accepted generality of the Marshall test. It is perfectly obvious that the questions here permit of direct answers which in

5. Section 371. Conspiracy to commit offense or to defraud United States

"If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both.

"If, however, the offense, the commission of which is the object of the conspiracy, is a misdemeanor only, the punishment for such conspiracy shall not exceed the maximum punishment provided for such misdemeanor."

Section 1501. Assault on process server

"Whoever knowingly and willfully obstructs, resists, or opposes any officer of the United States, or other person

duly authorized, in serving, or attempting to serve or execute, any legal or judicial writ or process of any court of the United States, or United States commissioner; or

"Whoever assaults, beats, or wounds any officer or other person duly authorized, knowing him to be such officer, or other person so duly authorized, in serving or executing any such writ, rule, order, process, warrant, or other legal or judicial writ or process—

"Shall, except as otherwise provided by law, be fined not more than $300 or imprisoned not more than one year, or both."

6. Actually, the first question is the crucial one. The two questions asked thereafter are significant only in the light of the incriminatory possibilities of the answer to the first.

themselves would be an admission of federal crime. Appellant has invoked that possibility in his assertion that a statement of "what he does" would tend to incriminate him "on the ground that it would incriminate him of a federal offense." Since the question asked permits an answer admitting federal crime, appellant urges that the court must accept this general assertion of crimination and that further inquiry whether he is in fact engaged in such illegal business is foreclosed. Literally construed Marshall's dictum—" * * * if a direct answer may criminate himself, then he must be the sole judge what his answer would be"— suggests an unqualified privilege to refuse to answer such a question as this. But we think there is one qualification which consists with the privilege and at the same time provides a salutary protection of the public interest in facilitating official inquiries.

The claimant of privilege must show the court enough beyond his bare statement of crimination at least to indicate that his claim was not clearly groundless, a contumacious assertion made in bad faith. In some circumstances, the nature of the question and the common experience of life may suffice for this purpose.[7] But the question, "What do you do now?" is so frequently asked of witnesses as a mere identifying question that without more a court may well regard it as normally too innocent to fall within the Marshall principle. The danger may not appear sufficiently real.

In this case, the district judge in course of oral argument took the position that he could not assume appellant to be any different from any other private citizen. To him the danger that the answer would reveal more than routine identification did not appear sufficiently real. Therefore, he apparently concluded that this was a case where the burden was on the witness to offer some affirmative indica-

tion of the incriminatory possibilities of the question. Cf. United States v. Rosen, supra; United States v. Weisman, supra. The witness having failed to do this, the privilege was denied him.

It is now quite apparent that the appellant could have shown beyond question that the danger was not fanciful. At the time of appellant's sentence, the district court was of the opinion that he was not entitled to bail pending appeal. Subsequently, on motion for reconsideration of the matter of bail, the applicant made allegations with respect to his reputation as a racketeer and notorious underworld figure in Philadelphia, and to newspaper articles which tended to support this reputation both generally and by specific allegation of prior conviction under the narcotics laws together with a picture of appellant with a narcotics official. This, we think, would rather clearly be adequate to establish circumstantially the likelihood that appellant's assertion of fear of incrimination was not mere contumacy.

These data were included in the record on the contempt appeal. But the government has moved to strike the data on the ground that the information offered in support of the bail motion was not before the court when it found appellant in contempt, and therefore cannot be considered now. We agree and disregard these data.

But, these data aside, was there enough before the district court to suggest that appellant's claim that direct answer to the question "What do you do now?" would be incriminatory was not clearly groundless.

We think that it is somewhat easier to answer this question if we remember that the court, ruling on a witness' claim of privilege against self-incrimination, is merely trying to secure some credible indication other than the word of the witness himself that the privilege is being asserted in good faith. It is certainly

---

**7.** E. g., Alston v. State, 1896, 109 Ala. 51, 20 So. 81 (witness asked "if he did not shoot Dean Edwards"); People v. Spain, 1923, 307 Ill. 283, 138 N.E. 614 (witness in bribery-conspiracy investigation asked whether he gave money to member of legislature).

normally impossible without removing the privilege itself for the court to have assurance. Simply as a method of accommodating the privilege with the legitimate interest of the government in securing information, the court requires some collateral indication of the good faith of the witness. If the question is innocent on its face, it remains for the witness to call to the court's attention in some appropriate fashion such facts as point to its danger.

 So far the members of the Court are in agreement. We divide in applying the discussion already had to the facts of this case. The view of the writer of this opinion is as follows: The court in this case knew the setting of the controversy. It was a grand jury investigation of racketeering and federal crime in the vicinity. The court should have adverted to the fact of common knowledge that there exists a class of persons who live by activity prohibited by federal criminal laws and that some of these persons would be summoned as witnesses in this grand jury investigation. These considerations indicate a sufficient likelihood of good faith in the claim of privilege to sustain it.[8]

The majority of the Court, however, disagrees with this conclusion. It believes that the subject-matter of the grand jury's investigation gives no notice to the trial judge of the quality of any particular witness. Many kinds of witnesses come before grand juries and there is no reason for the judge to believe, in the absence of evidence, that any particular witness is so connected with underworld activities that a statement of his occupation will tend to incriminate him. The majority thinks that the witness here failed to give the judge any information which would allow the latter to rule intelligently on the

claim of privilege for the witness simply refused to say anything and gave no facts to show why he refused to say anything. Since the judge is and the witness is not the person who is to determine whether the claim of privilege is to be allowed, the majority concludes that the trial judge was right in saying that the witness had shown nothing which entitled him to the privilege which he claimed.

The judgment will be affirmed and the motion of appellee to strike certain portions of the record will be granted.

---

8. Appellant's counsel did call to the court's attention in the course of argument, although in a rather casual way, that appellant had a notorious reputation as an underworld figure. But the writer does not rely on this. See United States v. St. Pierre, 2 Cir. 1942, 128 F.2d 979, 981, where Judge Frank indicates that the court "must be apprised, in some more dependable manner than the mere statement of counsel, how the answer will incriminate the witness before we can allow the suppression of the truth." Nor is this a situation which imposes upon the court a duty to take judicial notice of reputation. Cf. Morgan, Judicial Notice, 57 Harv.L.Rev. 269, 274–75, 279 (1944).